QUAKER RUBBER CORPORATION (FORMERLY QUAKER CITY RUBBER CO.), PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 111538. Promulgated March 24, 1944.

*Osborne Mitchell*, *Esq.*, and *C. G. Rausch*, *C. P. A.*, for the petitioner.

*William D. Harris*, *Esq.*, for the respondent.

#### OPINION.

MELLOTT, *Judge*: The Commissioner determined a deficiency in income tax in the amount of $2,197.95 and an overassessment in de-

clared value excess profits tax in the amount of $72.62 for the calendar year 1939. Petitioner claims it has made an overpayment in income tax in the amount of $187.81, in addition to an overpayment in declared value excess profits tax, the total claimed overpayment being $260.43.

The sole charge of error is the refusal of the Commissioner to allow a dividends paid credit under section 27 (a) (4), I. R. C., as amended by section 222 of the Revenue Act of 1939,[1] in the amount of $165,452.83. The facts are found to be as stipulated; but we set out herein only those necessary for an understanding of the questions to be determined.

Petitioner, a corporation organized in 1916 under the laws of Pennsylvania, is engaged in manufacturing rubber products, its principal place of business being in Philadelphia. An income and excess profits tax return for the calendar year 1939 was filed with the collector of internal revenue for the first district of Pennsylvania, and taxes in the respective amounts of $26,517.12 and $683.61 were paid. The return was prepared on an accrual basis.

The adjusted net income shown by the return was $160,709.81. Respondent made several adjustments, none of which is contested, and determined the correct amount to be $160,183.31. He determined that petitioner is entitled to a credit of $44,655.83 under section 26 (c) (1), I. R. C., to a credit of $500 for additional Federal capital stock tax, and to a dividends paid credit of $18,990 under section 27 (a) (4), *supra*, the latter amount having been paid upon a long term loan made by the Pennsylvania Co., reducing it from $212,000 to $193,910.

In the petition it is alleged that petitioner, as at December 31, 1937, was indebted to the Frankford Trust Co. of Philadelphia (hereinafter called Frankford) in the amount of $148,747.49 and to the Second National Bank of Philadelphia (hereinafter called Second) in the amount of $105,587.41 "as revolving loans bearing 6% interest"; that as at December 31, 1938, the loans were in the amounts of $111,954.04 and $103,498.79; and that petitioner, during the taxable year, paid off the indebtedness to Frankford and reduced its obligation to Second by $53,498.79. These allegations are denied by the

---

[1] SEC. 27. CORPORATION DIVIDENDS PAID CREDIT.

(a) DEFINITION IN GENERAL.—As used in this chapter with respect to any taxable year the term "dividends paid credit" means the sum of:

\* \* \* \* \* \* \*

(4) Amounts used or irrevocably set aside to pay or to retire indebtedness of any kind, if such amounts are reasonable with respect to the size and terms of such indebtedness. As used in this paragraph the term "indebtedness" means only an indebtedness of the corporation existing at the close of business on December 31, 1937, and evidenced by a bond, note, debenture, certificate of indebtedness, mortgage, or deed of trust, issued by the corporation and in existence at the close of business on December 31, 1937, or by a bill of exchange accepted by the corporation prior to, and in existence at, the close of business on such date. Where the indebtedness is for a principal sum, with interest, no credit shall be allowed under this paragraph for amounts used or set aside to pay such interest. A renewal (however evidenced) of an indebtedness shall be considered an indebtedness.

respondent in his answer; but there is now no controversy between the parties as to the amount of the indebtedness at December 31, 1937, and December 31, 1938.

Under arrangements establishing credits over a definite period from January 25 to May 1, 1935, petitioner borrowed $100,000 from Frankford, issuing 13 notes in varying amounts and pledging its accounts receivable in an agreed ratio. When the accounts receivable were paid the payments were placed in a "special account," under the control of petitioner and Frankford, from which account Frankford would release funds provided sufficient new accounts receivable were pledged. This procedure was continued until August 26, 1935, when, at the insistence of Frankford's attorney, it was revised because the validity of the collateral could be questioned by other creditors in the event petitioner had financial difficulties. On that date Frankford canceled $100,000 of petitioner's notes, charging $21,361.44 to its "special account" and $78,638.59 to its regular checking account. On the same date it advanced petitioner $91,700 on a new demand note secured by a schedule of the same accounts receivable which had previously been pledged on the $100,000 notes. The proceeds of the new demand note were deposited in petitioner's regular checking account and applied to the payment of the $78,638.59 above referred to.

The demand note contained the provisions usually found in a carefully prepared collateral note and recited, *inter alia*, that the maker had deposited "balances of unpaid [enumerated] schedules," that it agreed to deposit such additional securities and property as might from time to time be demanded, and that it gave Frankford a lien upon and pledge of all property, including money, securities, and credits, which should then or at any time be in the possession of Frankford, including any balance in its deposit account. The note authorized sale by Frankford of the collateral, compromise or settlement of the assigned accounts, and provided that it should forthwith become due and payable in the event of insolvency or bankruptcy of the maker. The other demand notes hereinafter referred to were in the same, or substantially the same, form.

Each demand note was secured by accounts receivable to an amount of par of the note and 10 percent to 33⅓ percent more during the period from August 26, 1935, to September 1939. Collections on the pledged accounts receivable were applied first to the payment of the appropriate notes and any surplus was applied to the payment of the oldest unpaid note under the clause of the note by which the maker had agreed to deposit additional securities and property and to give Frankford a lien upon the property in its possession. Approximately once a month Frankford delivered to petitioner all notes of which payment in full had been effected in the manner indicated.

The arrangements for establishing credit are indicated by a supplemental stipulation of the parties from which it is found· that petitioner's president and vice president applied to Frankford and Second in the year 1935 for the granting of credit to it. Frankford's directors, as shown by the minutes, first agreed "to lend Quaker * * * up to $50,000 to be secured by assignment of $75,000 of their open accounts." Later this was increased to "$75,000 to be secured by assignment of $112,500 of their open accounts," then to $150,000 "on assignment of their bills receivable on 66⅔% basis," then the same amount on 75 percent basis and finally "to lend Quaker 83⅓% of their bills receivable, provided this company is furnished with a $50,000 bond against fraudulent assignments or embezzlement." This bond was not given. On April 15, 1936, Frankford's officers were instructed by the directors "to secure $25,000 bond against fraudulent conversion and embezzlement in the Quaker * * * loans" and they were authorized to lend it "up to $120,000 to be secured by $160,000 bills receivable (on 75% basis) all loans to be accompanied by carbon copy of invoices." On April 22, 1936, a resolution of the directors was adopted "that Quaker * * * be granted credit of $140,000, to be secured by $187,500 of their bills receivable, carbon copies of invoices to be filed with us and $30,000 bond * * *." Bond in that amount with a corporate surety was given to Frankford in April 1936. It was later replaced by a similar bond issued by another corporate surety. During a portion of 1937 petitioner was permitted to borrow on a 90 percent basis of assigned accounts receivable; but starting July 1, 1938, and continuing until 1939 loans were made only on a basis of 80 percent.

After August 26, 1935, petitioner pledged new accounts receivable each day with Frankford and gave it new demand notes. Customer's checks received by petitioner on the pledged accounts were endorsed by petitioner and turned over to Frankford each day. Frankford maintained a ledger account for petitioner, to which credit and debit entries were made practically every business day. Two typical days will illustrate how the records were kept. September 28, 1937, the amount owing was $135,866.06. On that date $2,297.14 was paid (by customer's checks) and $5,000 additional was borrowed; so at the close of business the aggregate indebtedness was $138,368.92. On the next day $5,312.42 was paid and $3,000 borrowed, the indebtedness at the close of the day being $136,056.50. The indebtedness fluctuated during the remainder of that year, the high being $149,630.50, the low $117,228.30, and the average [2] approximately $130,000. During 1938 the situation was somewhat the same. The high was $149,822.45, the low (September 23, 1938) $86,054.42, and the average [2] approximately

---

[2] The word "average," used several times hereinafter, means only the apparent average from a casual inspection of the account. No actual computation has been made.

$125,000. The indebtedness at the end of the calendar year 1937 was $148,747.49 and at the end of the calendar year 1938, $111,954.04.

The arrangements between petitioner and Second bank, though differing in detail, were essentially the same as those between petitioner and Frankford. The record is silent as to what was said or done prior to 1937 except that a line of credit had been sought. Second's minutes indicate, however, that on September 22, 1937 its "officers were authorized to loan Quaker * * * temporarily, up to 90% of their accounts receivable which are assigned to us." This seems to have been the only recorded action save the granting of "a line of 50,000" on December 20, 1939, following which an unsecured loan in that amount was made.

During 1935, 1936, and 1937 interest was charged on the indebtedness daily by Second but was paid by petitioner only once a month. The indebtedness to this bank from and after March 6, 1937, was approximately $100,000,[2] a typical day's transaction being the payment of $5,000 on account and the borrowing of an equal (sometimes greater and sometimes lesser) amount. The indebtedness at the end of the calendar year 1937 was $105,587.41 and at the end of the calendar year 1938, $103,498.79. The least amount of petitioner's indebtedness to Second prior to the taxable year was $67,643.98, on April 23, 1938.

A monthly summary of the notes issued by petitioner to Frankford, Second, and others during the years 1937, 1938, and 1939 is incorporated in the stipulation. They aggregate:

|  | Frankford | Second | Others |
|---|---|---|---|
| 1937 | $1,661,500 | $830,900 | $13,000.00 |
| 1938 | 1,130,250 | 624,000 | 816,497.05 |
| 1939 | 720,950 | 493,900 | [1] 2,732,329.20 |

[1] $1,597,163.23 of this amount was borrowed from First bank after August 1939.

In addition to borrowing upon its assigned accounts petitioner followed the practice of discounting its acceptances payable at the two banks and with other financial institutions. It also borrowed from other sources. The details need not be set out. It may be mentioned, however, that at the end of 1938 petitioner was indebted to Kensington National Bank in the amount of $117,269.12, the notes payable being secured by assigned accounts receivable.

"In July, 1939, petitioner negotiated with the First National Bank of Philadelphia for a line of credit secured by assigned accounts receivable and by so doing was able to pay in full and discharge the indebtedness secured by assigned accounts receivable which the petitioner had at that time with * * * Second * * * and Frankford." Thereafter the major portion of petitioner's borrowing was from this bank and its existing loans from Frankford and Second were rapidly liquidated as hereinafter related.

During August and September of 1939 petitioner borrowed only small amounts from Frankford but continued to pay over to it the checks received from its customers upon the assigned accounts. The indebtedness was reduced during August from a high of $151,855.05 to $39,117.40 and during the first two weeks of September the amount owing was paid in full. In September and October its borrowing from Second also ceased, its indebtedness declining from a high of $120,530.67 to $13,848.59 on October 28, 1939, when final payment in that amount was made.

During August 1939 petitioner borrowed from First National $247,653.74 and from others $345,166.07. On December 31 of that year it was indebted to First National in the amount of $282,826.56, to Second in the amount of $50,000, and to others in the amount of $170,000, exclusive of its long term debt.

In addition to the long term debt of $212,900, which, as shown above, was reduced in 1939 to $193,910, petitioner had loans outstanding on December 31 of the years 1936 to 1940 inclusive as shown in the following schedule:

| | 1936 | 1937 | 1938 | 1939 | 1940 |
|---|---|---|---|---|---|
| Notes payable unsecured or secured by merchandise | $13,000.00 | ---------- | $4,585.50 | $181,000.00 | $250,000 |
| Notes payable secured by assigned accounts | 135,241.39 | $254,334.90 | 332,721.95 | 275,309.36 | ---------- |
| Acceptances payable discounted | 58,819.02 | 96,852.08 | 67,333.33 | 55,975.21 | ---------- |

During 1940 petitioner's long term debt was increased from $193,910 to $325,090.

The dividends paid credit claimed by petitioner is the aggregate of the indebtedness to Frankford on December 31, 1938 ($111,954.04) and the amount by which it claims it reduced its indebtedness to Second from the amount outstanding at the end of 1938 ($103,498.79 − $50,000, or $53,498.79), viz., $165,452.83. It may be noted that the indebtedness to Frankford had been reduced to $86,054.42 on September 23, 1938, later being increased to the amount shown above, and the indebtedness to Second had been reduced to $67,643.98 on April 23, 1938, later being increased to the amount shown above. Thus it would seem that the "indebtedness * * * existing at the close of business on December 31, 1937," which continued until paid in 1939, could not exceed $153,698.40; and, if petitioner's theory be adopted that the $50,000 owing to Second on December 31, 1939, was a continuance of the earlier indebtedness, the amount paid during that year upon the 1937 indebtedness was $17,643.98 rather than $53,498.79. But the details of the computation need not trouble us at this juncture. We pass to a consideration of the larger and more difficult questions discussed by the parties.

Respondent seeks to justify his denial of the claimed credit on the assumption that, under the facts, no part of the indebtedness existing on December 31, 1937, continued in existence on January 1, 1939. He argues that the payments made in that year were upon indebtedness which came into existence after Jauary 1, 1938. Petitioner contends that the arrangements under which funds were secured from Frankford and Second constituted, in each instance, but a single contract loan, a "revolving fund," or a renewable credit loan; that the fact new notes were given to the banks from day to day does not require a conclusion the earlier ones were paid; that they were "really and substantially nothing but renewals of the same loans, over and over again"; and therefore that the major portion of the indebtedness existing at the close of business on December 31, 1937, was actually paid when, in 1939, it borrowed substantially the same amount from First National and liquidated its indebtedness to the other two. Respondent, in the alternative, claims that if the indebtedness were a continuing one, as contended by petitioner, then petitioner "is impaled upon the contrary horn of the dilemma," since the facts show that "the debt was continued with a new creditor and not paid in 1939 within the meaning of section 27 (a) (4)." He also argues that actual payment or retirement of the indebtedness is essential to the granting of the credit under the section and that a mere shifting of creditors is not sufficient.

Petitioner's basic contention is that all the elements of a "revolving fund," as defined in *United States* v. *Butterworth-Judson Corporation*, 297 Fed. 972, were present in the loans made by Frankford and Second to it. The definition relied upon is couched in the following language:

"Revolving fund" is a brief expression of recent coinage which usually refers to a renewable credit over a defined period. In simple parlance, it relates usually to a situation where a banker or merchant extends credit for a certain amount which can be paid off from time to time, and then credit is again given not to exceed the same amount. It may also mean a fund which when reduced is replenished by new funds from specified sources.

In the cited case the War Department had contracted with the corporation for the manufacture and delivery of a large quantity of picric acid. By a supplemental contract it had made an advance payment to the contractor of $1,500,000 to be repaid by credits on delivery of the acid. The court said there was "no occasion to be confused by phrases when the relations of parties are clearly defined in written agreements" and held that the fund "was not a so-called revolving fund," pointing out that "there was no provision that the credit should remain $1,500,-000, renewable from time to time * * *."

The case is of but slight aid in determining the question before us. Even if the definition were intended to be a comprehensive one, which

is doubtful,[3] it could not be found as a fact under the present record that either of the two banks had extended "renewable credit over a definite period" to petitioner or that either of them had furnished it a fund which, when reduced, would be replenished. The arrangement, especially after its revision at the suggestion of Frankford's attorney, was nothing more than a day by day borrowing upon new demand notes secured by new assigned accounts. There was no continuing contract that petitioner would borrow or that the bank would lend any specific amount; nor was there any continuing debt, except such as was created by each demand note. The lender, at the insistence of its attorney, deliberately chose to see to it that this was so.

The mere fact that payments upon the pledged accounts were sometimes applied to the payment of the oldest unpaid note does not, in our judgment, indicate, as contended by petitioner, that the excess collateral "constituted a fund from which notes were paid in the order of their age." As shown in the stipulation of the parties, collections "were applied first to the payment of the appropriate notes"—i. e., to the payment of the notes for which they had been pledged as collateral. But inasmuch as petitioner was continuously indebteded to the banks upon other and later notes it was perfectly natural, and indeed contemplated by the notes and by the parties, that all payments should be applied to reduce the amount owing upon them. This, however, is not an indication that the series of notes constituted "renewals of the same loans, over and over again." As a matter of fact no renewal of a note was ever made.

So far we have considered only the applicable statute, which appears to be unambiguous. Petitioner, however, insists that some support for its view may be found in the regulations; so it is appropriate they be examined. The portion of section 19.27 (a)–3 (a) of Regulations 103 relied upon by petitioner is shown in the margin.[4]

The regulation makes no attempt to define renewal, but recognizes that an indebtedness may be continued "if the creditor remains the same and the transaction is in effect a renewal." Both conditions,

---

[3] The court, immediately following the paragraph quoted above, expressed some doubt "whether these definitions are correct or not."

[4] * * * Such renewal need not be evidenced by one of the types of instruments enumerated in section 27 (a) (4), but it is sufficient if the debtor-creditor relationship evidenced by one of such instruments at the close of business on December 31, 1937, continues. An indebtedness once so renewed may be again renewed without depriving the corporation of the benefits of section 27 (a) (4). Indebtedness incurred after December 31, 1937, is not indebtedness within the meaning of section 27 (a) (4) even though the proceeds of the loan are used to discharge an indebtedness falling within the provisions of that section, as, for example, where money is borrowed from A to pay B, but, if the creditor remains the same and the transaction is in effect a renewal, the mere fact that it takes the form of a new borrowing, the proceeds of which are simultaneously used to discharge the prior obligation, will not of itself prevent the transaction from being a renewal within the meaning of section 27 (a) (4) and this section.

however, must exist. The mere fact that the creditor remains the same is not sufficient. Whether the transaction was, under the present facts, "in effect a renewal" is the essence of the present controversy. We are not convinced that it was. As pointed out above, no renewal of a note was ever made. Petitioner's practice, during the years 1936, 1937, and 1938 was to borrow, each business day, from $3,000 to $10,000 from each bank, assigning new accounts receivable. Old notes were paid off at substantially the same rate. There was no borrowing for the purpose of discharging, simultaneously, a "prior obligation," nor were the proceeds of any new loan "used to discharge the prior indebtedness." Petitioner's reliance upon the. regulation, therefore, in our opinion, is of but slight aid to it.

The parties discuss, upon brief, *Sun Pipe Line Co.*, 42 B. T. A. 1413, and *Piermont Corporation*, 43 B. T. A. 770; both affirmed, 126 Fed. (2d) 888; *B. D. Phillips, Inc.*, 47 B. T. A. 266; reversed, 134 Fed. (2d) 73; and *Raritan Co. of Delaware, Inc.*, 47 B. T. A. 857; affd., 136 Fed. (2d) 364; certiorari denied, 320 U. S. 753, all of which involved claims of personal holding companies under section 351 (b) (2) (B) of the Revenue Act of 1936 for credit for amounts set aside to pay or retire indebtedness incurred prior to January 1, 1934. Whether the act is cognate to section 27 (a) (4), *supra*, as contended by respondent, need not be decided. The cases were decided upon their facts; and while some of the language used in the opinions may be apposite a detailed discussion of the cases would only unduly extend this opinion. Nor need we notice at length respondent's alternative contention that petitioner would be "impaled upon the contrary horn of the dilemma" were we to find that the indebtedness existing on December 31, 1937, continued until 1939. Such finding, if made, would bring us face to face with the rationale of the *Sun Pipe Line Co.* case, *supra*, in which the court adopted the view that indebtedness means "an obligation to pay or perform and is synonymous with owing. Nowhere do the cases stress to whom." In that view, petitioner, during the taxable year, merely shifted creditors and the indebtedness continued. We prefer to rest our conclusion, however, upon the premise that the indebtedness existing on December 31, 1937, ceased to exist prior to the taxable year. Cf. *Pembroke Realty & Securities Corporation*, 42 B. T. A. 341, 349.[5]

We are of the opinion and now hold that petitioner has failed to show it is entitled to a larger dividends paid credit under section 27 (a) (4), *supra*, than respondent has allowed. Therefore,

*Decision will be entered for the respondent.*

---

[5] The cited case was reversed upon the first point—whether the amounts distributed were dividends—and the question discussed on page 349, which has some pertinency to the present issue, became moot. See *Pembroke Realty & Securities Corporation* v. *Commissioner*, 122 Fed. (2d) 232.